IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KELLY ANN ISEMAN,**                         Case No. 1:15 CV 1571

      Plaintiff,

      v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Kelly Ann Iseman ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons stated below, the undersigned reverses the Commissioner's decision and remands for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI in May and June 2012 (Tr. 217-53).[1] She alleged onset dates of January 1, 2011 (Tr. 228) and February 28, 2011 (Tr. 219, 248).[2] Her claims were denied initially and upon reconsideration. (Tr. 156-72). Plaintiff then requested a

---

1. Plaintiff filed an application for DIB on May 10, 2014. (Tr. 217-25). She filed applications for SSI on May 15, 2012 and June 14, 2012. (Tr. 226-53).
2. In August 2011, Plaintiff filed for DIB alleging the same onset date – February 28, 2011. (Tr. 215-16). This claim was denied administratively and she did not appeal. (Tr. 87-98).

hearing before an administrative law judge ("ALJ"). (Tr. 33-34). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 8, 2013, in Cleveland, Ohio. (Tr. 35-86). On June 4, 2014, the ALJ found Plaintiff not disabled. (Tr. 12-32). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on August 9, 2015. (Doc. 1).

FACTUAL BACKGROUND

*Personal Background and Testimony*

Plaintiff was 44 years old at the time of the ALJ hearing and lived in an apartment with her husband and adult son. (Tr. 40-41). She has a high school education and one year of online college. (Tr. 42). When asked whether she has problems with reading or writing, Plaintiff replied: "No, my comprehension is slow, but I can read." *Id.*

Plaintiff is left-handed and stated she gets pain that shoots from her neck down her left arm; her left hand is often numb and fingers feel heavy. (Tr. 43-44). She estimated her neck and left arm pain is 6-7/10 on an average day. (Tr. 44). She estimated her low back pain is 4-6/10 on an average day. (Tr. 49). The low back pain is the result of trauma from an accident. (Tr. 48). Plaintiff was taking pain medication and a muscle relaxer at the time of the hearing, but testified these did not eliminate her pain, only took the edge off. (Tr. 44-45, 49).

Regarding her daily activities, Plaintiff testified that she cooks, does some dishes, does not do laundry, but does help fold it because "it helps keep [her] hands moving." (Tr. 57). She goes to the grocery store, goes to church on Sunday, reads, takes care of her cat, and picks up around the house. (Tr. 58-59). When she grocery shops, she holds on to the shopping cart to stabilize herself. (Tr. 64). She dusts and sometimes sweeps, but does not mop or vacuum. (Tr.

60). She can shower and get herself dressed without help (Tr. 58), but cannot fasten buttons (Tr. 46). She uses her right hand to wash her hair. (Tr. 61).

Plaintiff drinks out of a bottle—using her right, rather than left hand—instead of a cup. (Tr. 46). She also testified if she is not having shooting pain in her left arm, she can pick up a cup with her left hand. (Tr. 46-47). She stated she could not pick a coin up off the table with her left hand. (Tr. 47). Plaintiff uses a computer occasionally, but she uses her right hand for the mouse because she cannot click with her left, and can only type for a few minutes before her left fingers go numb. (Tr. 61). She drops eating utensils once or twice during a sit down meal. (Tr. 62). She is not able to do crafts—something she enjoyed before—because she often drops things. (Tr. 59). She goes to bed between 10:00 and 11:00 p.m. and gets up between 6:00 and 8:00 a.m., but wakes frequently. (Tr. 58-59).

She testified to driving approximately twice per week, but has difficulty because moving her right leg back and forth causes "pain shooting up [her] spine" from her lower back. (Tr. 41-42). She leaves the house four to five times per week: "[t]o the doctors and we try to hit the shopping mall." (Tr. 51). She goes to therapy approximately three times per week by herself. (Tr. 59). She has trouble with her balance and stumbles frequently because of her sciatic nerve. (Tr. 64-65).

Plaintiff estimated she could lift eight to ten pounds, and walk 100 yards before needing a break. (Tr. 51). She thought she could stand for five minutes before needing to sit, and sit for ten to fifteen minutes before needing to move. (Tr. 53).

Plaintiff testified to taking medication for her bipolar disorder. (Tr. 53). She has ups and downs on a daily basis, but the medications "kind of help." (Tr. 54). Plaintiff also has anxiety, but "[i]t's not like an all the time thing." (Tr. 54). She gets more anxious outside the home, and

gets anxious about her adult children. (Tr. 54-55). When she was working, she did not have trouble interacting with people. (Tr. 77-78). She testified she tends to get depressed before bed, reflecting on things that happened that day. (Tr. 55).

She recently started a new medication because she was hearing voices, and it was helping. (Tr. 62). Plaintiff testified she has mild seizures once or twice a week and that the new medication was also intended to help with those. (Tr. 64). Plaintiff also testified to having multiple personalities in the past. (Tr. 67). She testified she was hospitalized in 2010 or 2011 for psychiatric problems. (Tr. 64).

### Medical Records Related to Physical Limitations

In December 2008, Plaintiff sought treatment for shoulder pain. X-Rays ordered by Dr. Antony George—an occupational and sports medicine physician—show mild to moderate spurring of the mid and lower thoracic spine and mild spurring of the lumbrosacral spine. (Tr. 323-24). The conclusion was "mild to moderate degenerative changes" and "mild relatively diffuse degenerative changes." *Id.* A May 2007 cervical spine MRI showed "slight focal left paracentral eccentric disk bulge at C3-C4." (Tr. 327). In May 2009, an MRI of Plaintiff's left shoulder showed "[m]inimal findings with slight tendonitis." (Tr. 325).

Plaintiff continued treatment with Dr. George during 2010 for her shoulder, neck, and back pain. (Tr. 339-57). At the beginning of 2011, Plaintiff reported "doing ok", "sleeping better", and that exercises were helping. (Tr. 338). Records show during the beginning of 2011, Dr. George prescribed Percocet, Ulram, Baclofen, and Voltaren (Tr. 330-38). Dr. George's records also show Plaintiff's symptoms increasing with increased physical activity. (Tr. 335, 337). On March 1, 2011—the day after Plaintiff's alleged onset date—Plaintiff reported to Dr. George she had a cracked rib from helping a friend move and her pain was at a 10/10. (Tr. 335).

4

In April 2011, Plaintiff complained of shoulder pain and Dr. George gave her injections and ordered an MRI of her cervical spine and left shoulder. (Tr. 332-33). The cervical spine MRI indicated: "[l]eft lateral disc herniation at the C3/4 level." (Tr. 321). The shoulder MRI showed: 1) "[m]ild subacromial subdeltoid bursitis"; and 2) "[m]ild supraspinatus tendinopathy with mild acromioclavicular athrosis unchanged from prior examination." (Tr. 322). At a follow up visit, Plaintiff stated the injections had not helped and Dr. George continued Percocet, Oxycodone, Baclofen and Tiazadine. (Tr. 332). Further records from Dr. George in 2011 show Plaintiff continued to have neck, shoulder and back pain. (Tr. 330-32, 539-44). In October 2011, Plaintiff stated she had popping and pain with movement in her shoulder. (Tr. 542). Dr. George noted a reduced range of motion and suggested treatment with hot packs. *Id.* These records also show Dr. George continued Plaintiff's medications and performed OMT. (Tr. 330-32, 539-44).

In February 2012, Dr. George suggested Plaintiff see a neurologist after she reported continuing constant left shoulder and neck pain with numbness in left hand fingers. (Tr. 537). Dr. George also scheduled an EMG after seeing Plaintiff in March 2012. (Tr. 535, 537). Neurologist Dr. Norton Winer performed an electromyogram and nerve conduction velocity study on June 19, 2012. (Tr. 579-80). There were no findings of peripheral nerve entrapment but some fibrillations on the left at C4-5 of the cervical paraspinal muscles. *Id.* Dr. Winer's impression was "[p]ossible left C4-5 radiculitis; correlate with cervical MRI results (lateral disc herniation C3-4 to left side)." *Id.*

In August 2012, Dr. Winer performed a cervical nerve block without any relief of symptoms and suggested Plaintiff undergo a repeat MRI. (Tr. 577-78). Dr. George also noted Plaintiff reported no change from the shot and continued to complain of shooting pain from the base of neck through left shoulder. (Tr. 564). Records from Dr. George from September and

October 2012 show Plaintiff's pain continuing. (Tr. 581-85). In October, Plaintiff reported her pain was a 7/10 and that it improved with heat, exercise and medication. (Tr. 582).

In March 2013, Plaintiff began physical therapy with Joseph Oliverio at Layton Physical Therapy. (Tr. 606-07). Her initial evaluation showed decreased range of motion in cervical spine and left shoulder, decreased motion strength, postural deviations, pain, and decreased functional activities. (Tr. 607). Plaintiff continued physical therapy in the following months. (Tr. 597-605). Mr. Oliverio gave Plaintiff exercises for stretching and strengthening, and she was noted to have a "fair" response to therapy. (Tr. 600).

Dr. Paul C. Hanahan ordered a lumbar spine MRI for low back pain, which was performed on May 4, 2013. (Tr. 592-93). The MRI result was "[d]egenerative disc disease at L5-S1", "[n]o evidence for definite root impingement", "[n]o evidence for vertebral body fracture." (Tr. 592). Plaintiff saw Dr. Hanahan on May 23, 2013 for follow up on neck and low back pain. Office notes indicate Plaintiff "was last seen in this office on 4/25/13." (Tr. 620). Dr. Hanahan reviewed Plaintiff's MRI and physical therapy, stating she was "doing traction therapy which has helped her lower back symptoms" but that she "continues to have some pain going down the right leg" and her [n]eck status is relatively stable". (Tr. 620).

Plaintiff again saw Dr. Hanahan on June 20, 2013 and he noted continued neck pain going down the left arm and lower back pain going down the right leg. (Tr. 619). Plaintiff reported she had "difficulties walking greater than a half a mile to 1 mile" and "inability to sit in one position for any extended period of time." *Id.* At that appointment, Dr. Hanahan filled out an assessment form stating Plaintiff could: 1) lift 10 pounds on average, five pounds frequently, and a maximum of fifteen pounds occasionally; 2) stand and/or walk for a total of two hours in an eight-hour workday, and only fifteen minutes without interruption; 3) sit for three hours in an

eight-hour workday, and only thirty minutes without interruption. (Tr. 614). In support of his assessment, Dr. Hanahan cited "neck and low back pain, MRI findings." *Id*. He opined Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. *Id*. He stated Plaintiff's ability to see, hear, or speak was not impaired, but her ability to reach, handle, feel and push/pull were affected by her neck and back pain. *Id*. In support of this assessment Dr. Hanahan cited weakness in Plaintiff's left arm and restricted range of motion in her lower back. *Id*. He opined Plaintiff could have no exposure to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, or vibration because they would "cause more pain." *Id*. Dr. Hanahan believed Plaintiff would be "off task" 25% or more of the work day, and would miss about three days per month. *Id.*

### *State Agency Physicians – Physical Assessment*

In June 2012, state agency physician William Bolz, M.D., reviewed Plaintiff's medical records. (Tr. 116-19, 121-22). He concluded Plaintiff had the residual functional capacity to lift 20 pounds occasionally and ten pounds frequently. (Tr. 117). She could stand and/or walk about six hours in an eight-hour workday, and sit for six hours. *Id.* Her ability to push and/or pull was limited to frequent in her left upper extremity. *Id.* He concluded Plaintiff had postural limitations based on her cervical degenerative disc disease that would limit her to frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling or crouching; and occasional crawling. (Tr. 117-18). Regarding Plaintiff's manipulative limitations, she stated Plaintiff was limited to occasional overhead reaching with the left arm because of the cervical degenerative disc disease and radiculopathy. (Tr. 118).

In October,\ 2012, state agency physician Lynne Torello, M.D., reviewed the record and reached the same conclusions as Dr. Bolz. (Tr. 132-34).

*Medical Records Related to Mental Limitations*

In June 2010, Plaintiff received an initial psychiatric evaluation at Signature Health on referral from Huron Road Hospital. (Tr. 502-05). Robin Krause, RN, CNS, APRN, completed the evaluation and noted Plaintiff had inpatient treatment for suicidal ideas earlier in the month. (Tr. 502). Ms. Krause diagnosed Plaintiff with Bipolar I disorder and assigned her a Global Assessment of Functioning (GAF) score of 45-50, indicating serious symptoms.[3]

Plaintiff continued to treat with Ms. Krause through November 2010, who adjusted her medications and noted continued symptoms including anxiety and sleep difficulties, but also mood improvements. (Tr. 506-13).

In May 2011, Plaintiff underwent an assessment by Holly Butterfield, BA, at Signature Health that included her psychiatric health. (Tr. 406). Ms. Butterfield encouraged Plaintiff to discuss applying for disability based on her shoulder and neck problems. (Tr. 407).

In June 2011, Ms. Butterfield contacted Plaintiff by phone. (Tr. 411). Plaintiff stated she was due to report to jail at the end of the month and would follow up when she was released. *Id.*

On August 4, 2011, Plaintiff  reported to Ms. Butterfield that she had a "mental break" during her incarceration because she did not receive her medications for two weeks. (Tr. 413).

On August 8, 2011, Plaintiff presented to the emergency room after expressing suicidal thoughts. (Tr. 420). She was admitted to the hospital. *Id.* The assessment indicated Plaintiff was delusional and "possibly having hallucinations." (Tr. 431). She presented as angry and agitated and unable to identify the year or date. *Id.* She struggled to put sentences together, struggled to

---

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000) (*DSM–IV–TR* ). GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.* at 34.

maintain eye contact, and her answers were not appropriate to the questioning. *Id.* Plaintiff was tearful when meeting with a social worker. (Tr. 432).

Plaintiff returned to Ms. Krause in August 2011. (Tr. 514-15). Ms. Krause noted she was "very anxious" and "mildly disheveled" but that her speech was coherent. (Tr. 514). She reported hearing sounds and seeing shadows, but no command hallucinations. *Id.* She reported getting along better with her husband. *Id.* Ms. Krause continued the diagnosis of Bipolar I disorder. (Tr. 515).

In September 2011, Plaintiff reported no psychotic symptoms but that she was not sleeping well. (Tr. 526). Later that month, Ms. Krause noted no psychotic symptoms, no auditory or visual hallucinations, and no delusional thoughts. (Tr. 525). Ms. Krause adjusted Plaintiff's medications. *Id.*

In March 2012, Plaintiff was anxious and depressed, but her speech was coherent. (Tr. 523). She reported a decreased appetite and difficulty sleeping. *Id.* This was her first visit to Ms. Krause since December 2011. (Tr. 524). Ms. Krause adjusted her medications. (Tr. 523).

In June 2012, Plaintiff told Ms. Krause she had applied for DIB and was losing her insurance in September because her son is turning 19. (Tr. 555). She reported she had been looking for work and applying for jobs. *Id.* She had some mood swings and looked anxious, but her speech was relevant. *Id.* She continued to report difficulty sleeping and also reported seeing shadows and hearing the mumbling voice of her mother. *Id.*

In October 2012, Ms. Krause noted Plaintiff was "anxious in her mood, wanting controlled substances to help with her mood, which [Ms. Krause] declined to give her." (Tr. 576). Ms. Krause also noted Plaintiff refused the counseling she "highly recommended." *Id.* Ms.

Krause assessed Plaintiff with a GAF score of 55, indicating moderate symptoms, at this appointment.[4]

In November 2012, Ms. Krause completed a "Medical Source Assessment (Mental)." (Tr. 590-91). She concluded Plaintiff would have trouble doing most types of work-related activities for 11-20% of the workday, or more than 20% of the workday. *Id.* She also noted Plaintiff would be absent from work approximately four days per month. (Tr. 591).

Ms. Krause had two phone conversations with Plaintiff in April 2013. She reported she was "doing well" and "mood is stable." (Tr. 596). Plaintiff reported no mood swings or racing thoughts. *Id.* Ms. Krause noted she was "responding well" to treatment. (Tr. 595). Ms. Krause told Plaintiff she needed to schedule a follow up appointment as she had not been seen since October 2012. *Id.*

In May 2013, Ms. Krause noted Plaintiff's mood was anxious and speech was coherent. (Tr. 594). She continued to note difficulty sleeping and decreased appetite. Plaintiff wanted "a pet therapy letter in order to have a pet." *Id.* Ms. Krause assessed a GAF of 55 at this appointment. *Id.*

In June 2013, Plaintiff had a follow up appointment with Ms. Krause. (Tr. 618). Her mood was anxious and she reported auditory and visual hallucinations, seeing shadows and hearing her mother's mumbling voice. *Id.* Ms. Krause again assigned Plaintiff a GAF score of 55. *Id.*

At this appointment, Ms. Krause completed a second "Medical Source Assessment (Mental)". (Tr. 616-17). Many of her answers were the same as the prior assessment, however

---

4. A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Diagnostic & Statistical Manual of Mental Disorders,* 34 (4th ed., Text Rev.2000) (*DSM–IV–TR* ).

Ms. Krause found Plaintiff's ability to "[u]nderstand and remember short, simple instructions" had worsened from being problematic 11-20% of the time to more than 20% of the time. (Tr. 616). She also found Plaintiff's ability to make "simple work-related decisions" had improved from being a problem more than 20% of the time to 11-20% of the time. *Id.* Under the social interaction category, Ms. Krause found Plaintiff's abilities to: 1) "[a]ccept instructions and respond appropriately to criticism from supervisors"; 2) "[g]et along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 3) "[m]aintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness", had improved from being problematic more than 20% of the time to being problematic 11-20% of the time. (Tr. 617). Finally, Ms. Krause found Plaintiff's ability to "set realistic goals or make plans independently of others" had improved to only being a problem 11-20% of the time. (Tr. 617). Ms. Krause noted Plaintiff would miss more than four days per month as a result of her impairments. *Id.*

### *State Agency Physicians – Mental Assessment*

In September 2011, Carl Tischler, Ph.D., provided an opinion on behalf of the state agency regarding Plaintiff's mental limitations. (Tr. 87-92, 95-96). He concluded Plaintiff would be moderately limited in her ability to carry out detailed instructions, but not significantly limited in the ability to carry out very short and simple instructions. (Tr. 95). He opined she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* Regarding her social interaction limitations, he concluded she would be moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from

supervisors. *Id.* In adaptation, he found Plaintiff would be moderately limited in her ability to respond to changes in the work setting. (Tr. 96).

In June 2012, Jennifer Swain, Psy.D., examined Plaintiff's mental impairment records on behalf of the state agency. (Tr. 103, 107-08). She concluded Plaintiff would have mild limitations in restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 103). In reaching these conclusions, Dr. Swain relied on the fact that Plaintiff "report[ed] no difficulty caring for her personal needs [without] assistance. . . . On a typical day she attends to her personal care, performs HHC's, job hunts, attends appointments, and does therapy exercises at home. She prepares meals for herself and goes to the grocery [without] difficulty. [Plaintiff] reports no difficulty following written/oral instructions." (Tr. 107). Under concentration, persistence, and pace, Dr. Swain opined Plaintiff was moderately limited and "capable of completing tasks which are relatively static in nature and do not require a fast work pace. Limited [due to] depressive [symptoms] that may interfere with maintaining concentration." *Id.*

In September 2012, Dr. Roseann Umana, Ph.D., examined Plaintiff's records on behalf of the state agency and agreed with the previous assessment. (Tr. 129-130, 134-35).

### *VE Testimony and ALJ Decision*

A VE testified at the ALJ hearing. (Tr. 70-85). The ALJ first asked the VE to consider a hypothetical individual with Plaintiff's vocational profile who is:

> limited to lifting and carrying no more than 20 pounds occasionally and ten pounds frequently. Is able to stand and walk for approximately six hours in an eight-hour workday. The individual is limited to frequent push/pulling with the left upper extremity. She can occasionally climb ladders, ropes or scaffolds and crawl.
>
> She is frequently able to climb ramps or stairs, stop, kneel and crouch. She is limited to occasional overhead reaching with the left upper extremity.

> . . . [limited to] frequent handling and fingering with the left dominant upper extremity. This individual is further limited to simple to moderately complex tasks with no fast paced work, no strict production quotas, minimal changes in the work setting.

(Tr. 76-77). The VE testified such an individual could perform Plaintiff's past work as a maid, but not as a cashier or shipping weigher. (Tr. 78-79).

The ALJ then modified the hypothetical to include occasional handling and fingering with the left extremity, rather than frequent. (Tr. 79). The VE testified such a restriction would rule out the maid job. (Tr. 79-80). He testified other jobs would be available for such an individual such as: usher, school bus monitor, and hostess. (Tr. 80).

In a third modification, the ALJ posited a hypothetical including the original limitations but also limiting the individual to:

> lifting and carrying no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers or small tools. Standing and/or walking for a total of two hours in an eight-hour workday. Sitting for a total of six hours in an eight-hour workday. [And] frequent handling and fingers with the left dominant upper extremity.

(Tr. 81). The VE stated such an individual could perform jobs such as food and beverage order clerk, charge account clerk, and call out operator. *Id.*

Finally, in a fourth hypothetical the ALJ restricted the individual to occasional fingering and handling with the restrictions of the third hypothetical. The VE testified no work would be available to such an individual. (Tr. 82).

Counsel asked questions with additional limitations such as a sit/stand option, and sedentary work with occasional use of the left upper extremity, and need to leave work early or show up late one day per week. (Tr. 84). The VE testified that with such restrictions, there would be no jobs available. (Tr. 84-85).

In June 2014, the ALJ concluded Plaintiff had the severe impairments of cervical degenerative disc disease with radiculopathy, lumbar degenerative disc disease, and bipolar disorder, but these severe impairments did not medically equal any listed impairment. (Tr. 18-21). The ALJ then found Plaintiff had the residual functional capacity "(RFC") for work that involves:

> lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently; standing/walking for approximately six hours in an eight-hour workday; sitting for approximately six hours in an eight-hour workday; frequent push/pull with the left upper extremity; occasionally climb ladders, ropes, or scaffolds, and crawl; frequently climb ramps or stairs, stoop, kneel and crouch; occasional overhead reaching with the left upper extremity; frequent handling and fingering with the left dominant upper extremity; and limited to simple to moderately complex tasks with no fast-paced work, no strict production quotas, and minimal changes in the work setting.

(Tr. 22). Considering the VE testimony and Plaintiff's age, work experience and the RFC, the ALJ found Plaintiff could perform her past work as a maid and was therefore not disabled. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial

evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

15

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two related objections to the ALJ's decision: 1) the ALJ afforded less than the proper amount of weight toward Plaintiff's treating physician regarding her physical limitations and psychiatric nurse practitioner regarding her mental limitations; and 2) in part as a result of the first error, the ALJ's RFC did not accurately reflect Plaintiff's limitations, and therefore the ALJ did not meet his burden at Step Five to show there are jobs available to Plaintiff.

### *Treating Physician Rule*

Plaintiff first argues the ALJ erred in failing to give controlling weight to the opinions of treating physician, Dr. Hanahan, and treating nurse practitioner, Ms. Krause. (Doc. 14, at 14-22). Plaintiff's argument implicates the well-known treating physician rule.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

16

inconsistent with other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243. Accordingly, failure to give good reasons requires remand. *Wilson*, 378 F. 3d at 544.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers,* 486 F.3d at 242 (quoting SSR 96–2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson,* 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id; see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2011) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible with other evidence of record: there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

*Dr. Hanahan*

Plaintiff also argues the ALJ's reasons for rejecting portions of Dr. Hanahan's opinion and giving "little weight" to others were not supported by substantial evidence. (Doc. 17, at 15-16). The Commissioner responds that the ALJ reasonably determined that Dr. Hanahan's assessment was not consistent with evidence in the record. (Doc. 18, at 14). The undersigned finds Plaintiff's objection in this regard well-taken.

The ALJ rejected Dr. Hanahan's opinion that Plaintiff could not lift more than 15 pounds occasionally or more than five pounds frequently as "not supported by the evidence, including this source's own records that are found in Exhibits 2F, 8F, 10F, and 14F." (Tr. 24). Exhibits 2F, 8F and 14F are from Plaintiff's pain management physician, Dr. George, not Dr. Hanahan. (Tr. 329-95, 529-50, 581-89). The ALJ seems to have confused Dr. Hanahan and Dr. George in his analysis. *See* Tr. 24-25. Exhibit 10F includes the results of the cervical epidural nerve block and nerve conduction velocity study performed by Dr. Winer. (Tr. 559-62). The ALJ noted he gave little weight to Dr. Hanahan's opinion about Plaintiff's ability to sit, stand, and walk "[f]or similar reasons." (Tr. 24-25). Finally, the ALJ rejected Dr. Hanahan's opinion that Plaintiff would be "'off-task' at least 25 percent of the work day and miss about three days of work each month" because "[Plaintiff]'s pain management physician is not a psychologist or psychiatrist." (Tr. 25).

As stated above, the purpose of the "good reasons" requirement is "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers,* 486 F.3d at 242 (quoting SSR 96–2p, 1996 WL 374188, at *4). There may well be valid reasons for discounting Dr. Hanahan's opinion, but the exhibits cited—records from a different doctor, with a statement that these are "the source's own

records" (Tr. 24)—do not "make clear" to this reviewer "the reasons for that weight." *Id.* Rather, they indicate the ALJ conflated Dr. Hanahan with Dr. George.

The Commissioner argues Dr. Hanahan's opinion is inconsistent with Plaintiff's April 2011 MRI and this is a valid reason for discounting his opinion. (Doc. 18, at 12-13). While the ALJ cited to Exhibit 8F in his rejection of Dr. Hanahan's opinion, and Exhibit 8F (22 pages of records from Dr. George) includes MRI results, the ALJ makes no mention of the MRI, or any specifics regarding why he finds these records inconsistent with Dr. Hanahan's opinion. Therefore, relying on this argument to uphold the ALJ's decision would result in the Court engaging in prohibited *post hoc* rationalization. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 192 (6th Cir. 2009); *Martinez v. Comm'r of Soc. Sec.*, 692 F.Supp.2d 822. 826 (N.D. Ohio 2010).

As such, under the treating physician rule, remand is required for further explanation of the reasons for the weight given to treating physician Dr. Hanahan's opinion regarding Plaintiff's physical limitations.[5] *See Friend*, 375. F.App'x at 551 ("A failure to follow the procedural requirement of 'identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" (quoting *Rogers*, 486 F.3d at 243)).

---

5. The ALJ also rejected Dr. Hanahan's opinion about how often Plaintiff would miss work or be "off task." (Tr. 25). In so doing, he stated "the claimant's pain management physician is not a psychologist or psychiatrist." *Id.* Medical specialty is an appropriate category to be considered when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2). Again, this statement appears to be based on confusing Dr. George with Dr. Hanahan, however, Dr. Hanahan is also not a psychologist or psychiatrist. Rather than rule piecemeal on different portions of the ALJ's assessment of Dr. Hanahan's opinion, the undersigned remands for the ALJ to fully explain the reasons for the weight given to that opinion.

*Ms. Krause*

Plaintiff objects to the ALJ's reasoning for giving Ms. Krause's opinion little weight. (Doc. 14, at 16-18). The Commissioner responds that the ALJ's decision is supported by substantial evidence. (Doc. 18, at 16-19). The ALJ's reasons for discounting Ms. Krause's opinion about Plaintiff's mental functioning due to her bipolar disorder were threefold: 1) it was inconsistent with other evidence; 2) she is not an acceptable medical source under Social Security disability law; and 3) her opinions are internally inconsistent without valid explanation. (Tr. 20-21).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). Evidence from those who are "not acceptable medical sources" or "other sources", including nurse practitioners, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03, 2006 WL 2329939, at *2. Interpreting SSR 06-03, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

The ALJ is correct—and Plaintiff does not contest—that Ms. Krause is not an "acceptable medical source." Ms. Krause is therefore not afforded the same deference as a

20

treating physician, nor does the ALJ have to follow the "good reasons" requirement with regard to her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *2; *Leach v. Comm'r of Soc. Sec.*, 2015 WL 1221925, at *3 (N.D. Ohio). He does, however, have to evaluate her opinion.

The ALJ adequately considered Ms. Krause's opinion and explained the factors he deemed relevant: consistency with the record as a whole, and consistency internally. First, while Ms. Krause's assessment indicated Plaintiff would have more extreme difficulties with social functioning, the ALJ cites contrary record evidence to suggest otherwise. "Social functioning refers to your capacity to interact independently, appropriately, effectively and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(2).

The ALJ cited records to support his conclusion that Plaintiff had only mild restriction in social functioning. (Tr. 20, citing 330-32, 334-35, 407, 409, 411, 514-15, 523, 525-26, 535, 537-544, 555, 576, 594-96, 618). For example, a progress note from Ms. Krause on August 13, 2011, states Plaintiff "and her husband are getting along better" and that they have "always maintained a friendship even when a relationship has not been the best." (Tr. 514). The ability to get along with family members is explicitly mentioned in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(2).

The ALJ cited a May 2011 note from Ms. Butterfield stating Plaintiff called to report information about an upcoming jail sentence. (Tr. 409). This note also states Plaintiff has spoken to someone from "Church Network and is hopeful they can help, as well", but that she declined assistance from Signature Health. (Tr. 409). Another progress note from Robin Krause cited by the ALJ states "Her speech is relevant. Appearance is casual." (Tr. 525). Although Plaintiff

argues the records are "not germane", (Doc. 14, at 16), they do at least show Plaintiff was able to appropriately and effectively interact with a variety of people, including treatment providers. *See Vanarnam v. Comm'r*, 2014 WL 1328272, at *19 (E.D. Mich.) (adopting Report and Recommendation stating "plaintiff's ability to interact in a social setting can certainly include his ability to engage with his treaters in an appropriate manner, and thus the ALJ reasonably relied on these findings."). Additionally, as the ALJ mentioned in the previous paragraph of his decision regarding activities of daily living, Plaintiff was looking for jobs, and was able to shop in stores. (Tr. 19). As a whole, the cited records support the ALJ's determination that Plaintiff's social functioning limitations were not as extreme as Ms. Krause opined.

Second, with regard to concentration, persistence, and pace, the ALJ noted Plaintiff had been described as "alert and properly oriented" several times (Tr. 20 (citing Tr. 330-33, 334-35, 539. 542-44)), and that Plaintiff did not have difficulty concentrating during the ALJ hearing. He also credited the opinions of the state agency reviewing psychologists who found Plaintiff would have moderate difficulties in this area, rather than the marked limitations found by Ms. Krause. (Tr. 20). In reaching her conclusion, state agency reviewing psychologist Dr. Swain relied on the fact that Plaintiff "report[ed] no difficulty following written/oral instructions" and that she "prepares meals for herself and goes to the grocery without difficulty." (Tr. 107). Specifically regarding concentration, persistence, and pace, Dr. Swain opined Plaintiff was moderately limited and "capable of completing tasks which are relatively static in nature and do not require a fast work pace. Limited [due to] depressive [symptoms] that may interfere with maintaining concentration." *Id.* This, in combination with the inconsistencies discussed *infra*, is enough to support the ALJ's determination that Plaintiff's concentration, persistence, and pace was not as limited as Ms. Krause opined.

Finally, in his explanation for giving Ms. Krause's opinion little weight (with regard to both social functioning and concentration, persistence, and pace), the ALJ notes internal inconsistency. (Tr. 20-21). Between November 2012 and June 2013 Ms. Krause's improved her opinion about Plaintiff's ability to: 1) "[m]ake simple work-related decisions"; 2) "[a]ccept instructions and respond appropriately to criticism from supervisors"; 3) "[g]et along with coworkers or peers without distracting them or exhibiting behavioral extremes"; and 4) "[m]aintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness." (*Compare* Tr. 590-91 *with* Tr. 616-17).[6] The ALJ found: "[T]he fact that this source changed her answers to questions about [Plaintiff]'s social functioning abilities without reasonable explanation detracts from all of her opinions." (Tr. 20; *see also* Tr. 21 (ALJ uses same rationale regarding concentration, persistence, and pace.)).

An ALJ may properly reject a source's opinion because it is internally inconsistent without reasonable explanation. *See Driggs v. Comm'r of Soc. Sec.*, 2011 WL 5999-36, *6 (S.D. Ohio) ("[A]n ALJ may reject the opinion of a treating source where the treating physician's opinion is inconsistent with [that source's] own medical records."); *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) (An ALJ may reject an opinion when it contradicts an earlier opinion without explanation). Though Plaintiff is correct that Ms. Krause submitted her progress notes between November 2012 and June 2013 (Tr. 594-96, 618), the undersigned agrees with Defendant that the ALJ could reasonably conclude they did not provide a reasonable explanation for why Ms. Krause found improvement in these areas but not others. The progress notes state generally Plaintiff is "responding well" to treatment (Tr. 595) and

---

6. Ms. Krause changed her answers in these categories from stating Plaintiff would "have noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week" to would "have noticeable difficulty (distracted from job activity) 11-20 percent of the work day or work week." (*Compare* Tr. 590-91 *with* Tr. 616-17).

"doing well" (Tr. 596), but do not explain why Plaintiff would, for example, be better able to get along with coworkers, but not better able to interact appropriately with the general public. (*Compare* Tr. 591 *with* Tr. 617).

Plaintiff argues "there is a basis for giving nurse practitioner Robin Krause greater weight than that given by the ALJ." (Doc. 14, at 18). This may be true, but the ALJ provided sufficient basis and explanation for the weight he assigned Ms. Krause's "other source" opinion, and therefore the decision is supported by substantial evidence in this regard.[7] *Jones*, 336 F.3d at 477 ("[T]he Commissioner's decision cannot be overturned if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position so long as substantial evidence also supports the conclusion reached by the ALJ.").

### RFC Determination

Plaintiff's second argument is related to the first. She argues the RFC adopted by the ALJ did not accurately reflect Plaintiff's physical limitations. (Doc. 14, at 23). Because remand is appropriate for the ALJ to more fully explain the weight given to Dr. Hanahan's restrictions—some of which would change Plaintiff's RFC—the undersigned makes no finding regarding this alleged error at this time.

---

7. The ALJ, though giving little weight to Ms. Krause's opinions about what Plaintiff could do, did examine Ms. Krause's records and consider them in determining Plaintiff's impairments and fashioning her RFC. (Tr. 23-25).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is not supported by substantial evidence, and therefore reverses the decision of the Commissioner and remands for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

.

                              s/James R. Knepp II
                              United States Magistrate Judge